## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN MORGAN-REED, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> RACKSPACE TECHNOLOGY, INC., GAJEN KANDIAH, and MARK MARINO, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff John Morgan-Reed ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Rackspace Technology, Inc. ("Rackspace" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Rackspace; and (c) review of other publicly available information concerning Rackspace.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Rackspace securities between May 7, 2026 and July 8, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Rackspace is a hybrid cloud and AI solutions company that owns and operates physical infrastructure to host cloud services and artificial intelligence. Its Private Cloud segment offers programmatic infrastructure, cloud operating systems, platform-as-a-service, as well as cloud services tailored toward specific use cases. Its Public Cloud segment bundles public cloud infrastructure with Rackspace's expertise and managed services to deploy customers' applications on the public cloud platforms. The Company also provides Rackspace AI, a portfolio of AI services and solutions to help organizations scale AI adoption.

3. On May 7, 2026, Rackspace announced that it had signed a memorandum of understanding with Advanced Micro Devices, Inc. ("AMD") to "Establish New Category of Governed Enterprise AI Infrastructure." The multiyear partnership would "create an Enterprise AI

1

Cloud purpose-built for regulated enterprises and sovereign workloads where security, governance, and accountability are non-negotiable."

4.    On the same day, the Company held an earnings call in connection with the release of its first quarter 2026 financial results, wherein management touted the AMD deal and its impact on Rackspace's growth. Specifically, the Company's CEO Defendant Gajen Kandiah ("Kandiah") stated that the "AMD piece really fits into how" the Company's technology stack operates and that the AMD partnership "*give[s] [the Company] confidence in the full year Private Cloud growth profile.*"[1]   That full year guidance of Public Cloud Revenue was reaffirmed at $1.575 billion to $1.625 billion.

5.    However, on July 9, 2026, before the market opened, Rackspace published second quarter 2026 financial results and "a strategic and financial update on its transition to becoming the operator of the full enterprise AI stack." The Company revealed that its AI investments would require a significant re-prioritization of resources and, as a result, reduced its full year 2026 revenue guidance by $150 million. The Company also cut its full year 2026 Private Cloud revenue outlook by $25 million. Finally, the Company explained that "*[l]ower near-term margins reflect upfront growth investment and restructuring, ahead of AI revenue ramping*."

6.    On this news, Rackspace's stock price fell $2.21, or 33.6%, to close at $4.37 per share on July 9, 2026, on unusually heavy trading volume.

7.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

Company's enterprise AI efforts would require Rackspace to significantly re-prioritize its capacity and capital away from the profitable Private Cloud segment; (2) that Rackspace's Public Cloud revenue was declining as customers contracted directly with hyperscale cloud platforms; (3) that, as a result, Rackspace was likely to significantly reduce a material portion of its Public Cloud infrastructure resale business; (4) as a result, the Company's fiscal year 2026 revenue would be significantly impacted; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

3

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

13. Plaintiff John Morgan-Reed, as set forth in the accompanying certification, incorporated by reference herein, purchased Rackspace securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant Rackspace is incorporated under the laws of Delaware with its principal executive offices located in San Antonio, Texas. Rackspace's common stock trades on the NASDAQ exchange under the symbol "RXT."

15. Defendant Kandiah was the Company's CEO at all relevant times.

16. Defendant Mark Marino ("Marino") was the Company's Chief Financial Officer ("CFO") at all relevant times.

17. Defendants Kandiah and Marino (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.    Rackspace is a hybrid cloud and AI solutions company that owns and operates physical infrastructure to host cloud services and artificial intelligence. Its Private Cloud segment offers programmatic infrastructure, cloud operating systems, platform-as-a-service, as well as cloud services tailored toward specific use cases. Its Public Cloud segment bundles public cloud infrastructure with Rackspace's expertise and managed services to deploy customers' applications on the public cloud platforms. The Company also provides Rackspace AI, a portfolio of AI services and solutions to help organizations scale AI adoption.

19.    According to the 2025 Form 10-K, Public Cloud generated approximately 63% of total revenue ($1,696 M out of a total $2,685.7 M). However, according to the Q1 form 10-Q, in the three months ended March 31, 2026, Private Cloud was substantially more profitable with an operating margin of 24.7% (compared to Public Cloud's 4.7%). According to the 2025 Form 10-K, the 0.8% year-over-year increase in Public Cloud revenue was "driven by higher services revenue, partially offset by a reduction in infrastructure volumes."

### Materially False and Misleading
### Statements Issued During the Class Period

20.    The Class Period begins on May 7, 2026. On that day, Rackspace issued a press release announcing a Memorandum of Understanding with AMD to "***Establish New Category of Governed Enterprise AI Infrastructure***" and "create an Enterprise AI Cloud purpose-built for regulated enterprises and sovereign workloads where security, governance, and accountability are non-negotiable." The press release further purported to assure investors this collaboration would "***position Rackspace to complete its curated enterprise AI stack*** and introduce four integrated capabilities."

21.     The same day, the Company issued a press release reporting first quarter 2026 financial results, in which it provided full year guidance of Public Cloud Revenue of $1.575 billion to $1.625 billion. Specifically, the press release stated, in relevant part:

- Revenue of $678 million in the First Quarter, up 2% Year-over-Year

- Private Cloud Revenue was $235 million, down 6% Year-over-Year

- Public Cloud Revenue was $443 million, up 7% Year-over-Year

- First Quarter 2026 Cash Flow From Operating Activities was $5 million; Cash Flow From Operating Activities was $144 million on a Trailing-Twelve-Month Basis

- Rackspace Technology (RXT) and AMD sign Memorandum of Understanding to establish a new category of governed Enterprise AI Infrastructure

*                    *                    *

**Financial Outlook**

Rackspace Technology is providing guidance as follows:

|  | FY 2026 Guidance |
|---|---|
| **Total Revenue** | $2,600 - $2,700 million |
| **Private Cloud Revenue** | $1,025 - $1,075 million |
| **Public Cloud Revenue** | $1,575 - $1,625 million |
| **Non-GAAP Operating Profit** | $160 - $170 million |
| **Adjusted EBITDA** | $305 - $315 million |
| **Non-GAAP Loss Per Share** | ($0.15) - ($0.20) |
| **Non-GAAP Other Income (Expense)** | ($220) – ($230) million |
| **Non-GAAP Tax Expense Rate** | 26% |
| **Non-GAAP Weighted Average Shares** | 250 - 260 million |

22.     The same day, the Company held an earnings call in connection with its first quarter 2026 financial results, wherein management described Rackspace's growth and readiness for its new AI pivot, as well as purported details of the mechanics of the AMD deal. Specifically,

6

Defendant Kandiah stated that the "***AMD piece really fits*** into how" the Company's technology stack operates. Kandiah further stated the AMD partnership "***give[s] [the Company] confidence in the full year Private Cloud growth profile.***"

> And then having -- and th***en the AMD piece really fits into how -- first and foremost, it gives us CPU and GPU, which I think as we move further into inference and production workloads, being able to deliver that in an efficient manner allows us to now do it across sort of the CPU, GPU stack.*** And then in terms of the partnership itself, I think we are certainly well along the way there. I think we still need to get the financing locked down and sort of tightened up, but we feel pretty confident that we are on our way to getting that done and hopefully get it announced here in the near future. We feel pretty good about it.
>
>                      *                     *                     *
>
> The AMD partnership announced today adds a further layer of future optionality as governed AI compute becomes more central to how regulated enterprises operate. ***Together, these give us confidence in the full year Private Cloud growth profile we are reaffirming today.***

23. During that first quarter 2026 earnings call, Defendant Marino reaffirmed the fiscal 2026 guidance that had been provided in February. He stated: "Now on to our guidance. We are reaffirming our full year 2026 guidance in its entirety. Revenue, EBITDA and cash flow outlook all remain unchanged. The Q1 Private Cloud timing we described is fully reflected in our annual plan and our confidence in the full year outlook is unchanged."

24. On May 8, 2026, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2026. Therein, Rackspace purported to describe its "Business Mix Shift" as follows:

> The mix of revenue has shifted in recent years, from our Private Cloud offerings to infrastructure resale and services within Public Cloud. Private Cloud offerings are generally hosted on our own infrastructure and deliver higher segment operating margins, but also require a higher level of capital expenditures. Conversely, Public Cloud segment operating margins are lower, driven by high volumes of infrastructure resale revenue which come at significantly lower margins. However, Public Cloud requires significantly less capital expenditures. Going forward, we will continue to take a workload-centric approach and both Public and Private Cloud will be the net recipients of the workloads. The focus in Private Cloud will

7

be to defend and expand our revenue with new solutions. The focus in Public Cloud is on expanding segment operating margins by driving cost efficiencies and growing higher-margin services revenue.

25.     On June 16, 2026, the Company issued a press release announcing that Rackspace and AMD had signed a definitive agreement. Specifically, Rackspace stated, in relevant part:

AMD (NASDAQ: AMD) and Rackspace Technology® (NASDAQ: RXT), a global enterprise AI infrastructure and solutions provider, today announced the signing of a definitive agreement for the phased deployment of an initial 30 MW footprint dedicated to AMD-based compute deployments across Rackspace's global data centers beginning in late 2026 through 2028. The agreement operationalizes the Memorandum of Understanding announced May 7, 2026, and establishes AMD as a strategic technology partner at the silicon layer of Rackspace's governed AI stack.

At full deployment, 30 MW of dedicated AMD compute across Rackspace's footprint will represent meaningful capacity to serve regulated enterprise workloads, including healthcare providers who have expressed early interest in accelerated compute for clinical AI and inference at scale. This collaboration incorporates both AMD Instinct™ GPUs (including MI355X, MI350P, and future successor solutions) and AMD EPYC™ CPUs inside an integrated Enterprise AI Cloud architecture, enabling Rackspace to route each workload to the right compute with full accountability for performance and outcomes end to end.

"Enterprises in regulated industries need AI infrastructure that is governed from the ground up, with one operator accountable for business outcomes, not a collection of vendors each owning a piece," said Gajen Kandiah, CEO, Rackspace Technology. "This collaboration combines the right compute with the right operating model and delivers something the market hasn't offered before: a governed AI stack with one accountable partner from silicon to outcomes."

26.     Also on June 16, 2026, Rackspace filed a Form 8-K with the SEC announcing a workforce realignment plan "intended to accelerate the Company's strategic transformation as the operator for governed enterprise AI[.]" The Form 8-K stated, in relevant part:

On June 10, 2026, the Executive Committee of the Board of Directors of the Company approved a workforce realignment plan intended to accelerate the Company's strategic transformation as the operator for governed enterprise AI and to realign its workforce around how production AI is deployed, operated and scaled inside regulated enterprises. This realignment is predominantly driven by the Company's strategic decision to deemphasize certain legacy service delivery functions (primarily within its Public Cloud business unit) and geographic rationalizations in favor of redeploying resources toward its enterprise AI buildout.

8

This workforce realignment is expected to result in the termination of approximately 15% of the Company's global workforce. A majority of the impacted employees were notified on or around June 10, 2026, with additional exits planned to occur over the following 6 months, depending on role and jurisdiction.

***The Company estimates that it will incur one-time expenses of approximately $14 million to $19 million in connection with the workforce realignment, substantially all of which is expected to be incurred in 2026.*** These charges will consist primarily of severance payments, healthcare benefits, and other termination-related costs.

***Upon full implementation, the Company expects to realize approximately $75 million to $85 million in annualized run-rate savings compared to current expense levels. The Company intends to reinvest a significant portion of these anticipated savings in its highest-growth product and service areas, including forward-deployed engineering, AI solutions delivery, and enterprise AI infrastructure buildout.*** The Company may also implement additional measures in connection with its ongoing strategic transformation as it continues to evaluate opportunities to optimize its operations.

27.    The same day, the Company hosted an investor call to discuss the AMD partnership. Defendant Kandiah purported to assure investors of the strength of the Company's private cloud business, as follows:

A hyperscaler delivers compute, a systems integrator delivers services. Neither is accountable for governed AI in production end-to-end. ***That is the gap Rackspace is built to fill.*** We believe Rackspace is uniquely positioned to answer that question through trusted customer relationships, deep operational expertise and a global infrastructure footprint.

*         *         *

Since we established the public cloud business unit a few years ago, we have made significant progress building from an infrastructure-led operation into a services-led organization with deep capabilities across cloud delivery, platform engineering and managed operations. The capabilities we have built are the foundation we are building on. Our private cloud business has equally demonstrated the value of this model, operating some of the most demanding regulated workloads in health care, financial services and sovereign environments. The discipline, governance and accountability we have built in private cloud is the operating template for everything we are now scaling across the Enterprise AI platform.

What has changed is where those capabilities need to be directed. The customers we serve are moving from cloud adoption to AI in production. And that shift requires an operator who can manage the full stack end-to-end, not just the cloud

9

layer. *Our public cloud business is aligning to that imperative, concentrating investment on data and AI-led enterprise transformation, AIOps-driven managed services, and forward deployed engineering talent that operates across hybrid environments from edge to core to cloud. This includes a reduction in our workforce,* and Mark will take you through the details. This is the right decision and direction for Rackspace, and we are managing it with the care and the respect our Rackers have earned.

\*                    \*                    \*

Strategic focus requires specificity. *Rackspace has a clear path* to win in regulated industries, health care, financial services and sovereign cloud as the governed operator of Enterprise AI and in private cloud and governed infrastructure environments.

28.    During the same call, Defendant Marino purported to describe the expected cost of

the Company's AMD deal, stating in relevant part:

As Gajen outlined, integrating our go-to-market focus is the alignment of our structure to our strategy, and that alignment has a financial dimension. In connection with this transition, we announced a workforce realignment plan that includes a reduction of up to 15% of our global workforce. This realignment is predominantly driven by the company's strategic decision to deemphasize certain legacy service delivery functions, primarily within its public cloud business unit and geographic rationalizations in favor of redeploying resources towards its Enterprise AI build-out.

*We expect to incur onetime charges of approximately $14 million to $19 million in 2026. Following full implementation, we expect to realize approximately $75 million to $85 million in annualized run rate savings. A significant portion of those savings will be reinvested into our highest growth capabilities, including forward deployed engineering, AI solutions delivery and enterprise AI infrastructure build-out. This is a deliberate reallocation of capital from offerings that are not aligned to our strategic priorities towards the governed enterprise AI platform we are building. We view this as a time-limited cost with a clear and measurable return.*

29.    The above statements identified in ¶¶20-28 were materially false and/or misleading,

and failed to disclose material adverse facts about the Company's business, operations, and

prospects. Specifically, Defendants failed to disclose to investors: (1) the Company's enterprise AI

efforts would require Rackspace to significantly re-prioritize its capacity and capital away from

the profitable Private Cloud segment; (2) that Rackspace's Public Cloud revenue was declining as

10

customers contracted directly with hyperscale cloud platforms; (3) that, as a result, Rackspace was likely to significantly reduce a material portion of its Public Cloud infrastructure resale business; (4) as a result, the Company's fiscal year 2026 revenue would be significantly impacted; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

30.     On July 9, 2026, before the market opened, Rackspace published second quarter 2026 financial results and "a strategic and financial update on its transition to becoming the operator of the full enterprise AI stack." As part of its strategic update, the Company revealed that its AI investments would require a significant re-prioritization of resources. As such, the Company reduced its full year 2026 revenue guidance by $150 million. The Company also cut its full year 2026 Private Cloud revenue outlook by $25 million. Finally, the Company explained that "*[l]ower near-term margins reflect upfront growth investment and restructuring, ahead of AI revenue ramping*." Specifically, on that date, the Company issued a press release which stated as follows, in relevant part:

**Financial and Business Update**

The enterprise AI deployment end market has attractive demand characteristics. However, enterprise AI growth and deployments require discipline because of the resource-constrained nature of the capacity- and supply-side. Rackspace believes the correct strategic and tactical response in this environment is to prioritize our resources and focus on the activities that we believe provide the best returns to Rackspace's stakeholders.

The combination of our prioritization efforts, industry trends and current supply constraints results in a reduction of $150 million in our revenue expectations and $20 million in EBITDA. The details are illustrated in the table below.

| *$ in Millions* | Prior FY26 Outlook | | | New FY26 Outlook | | | Reason for Change |
|---|---|---|---|---|---|---|---|
| | Low | Midpoint | High | Low | Midpoint | High | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Private Cloud | 1,025 | 1,050 | 1,075 | 1,000 | 1,025 | 1,050 | • Lowered by $25 million. <br> • Exiting colocation and basic hosting revenues, reserving capacity for Enterprise AI. <br> • Supply timing and geopolitical factors compressing near-term delivery. |
| *Rev year/year %* | *4%* | *6%* | *9%* | *1%* | *4%* | *6%* | |
| Public Cloud | 1,575 | 1,600 | 1,625 | 1,450 | 1,475 | 1,500 | • Lowered by $125 million. <br> • Exiting low-margin resale as hyperscalers continue moving customers to direct contracts. |
| *Rev year/year %* | *(7)%* | *(6)%* | *(4)%* | *(15)%* | *(13)%* | *(12)%* | |
| **Revenue** | **2,600** | **2,650** | **2,700** | **2,450** | **2,500** | **2,550** | |
| *Rev year/year %* | *(3)%* | *(1)%* | *1%* | *(9)%* | *(7)%* | *(5)%* | |
| **Adjusted EBITDA** | **305** | **310** | **315** | **285** | **290** | **295** | • **Lower near-term margins reflect upfront growth investment and restructuring, ahead of AI revenue ramping.** |
| *Adj. EBITDA margin %* | *12%* | *12%* | *12%* | *12%* | *12%* | *12%* | |

31. The same day, the Company held a conference call to discuss the financial results. Defendant Kandiah explained the reduced guidance was in part due to the decision to "***redeploy []***

*capacity and capital towards higher-yielding AI deployments."* Specifically, Defendant Kandiah

stated, in relevant part:

> *To account for our transition away from certain low-margin engagements that will be redeployed to our enterprise AI business over the next 2.5 years, we are reducing our FY '26 revenue outlook by $150 million and our EBITDA outlook by $20 million, given the low-margin nature of the exited revenues across both business units and investments in AI compute capacity.* Within Public Cloud, we have steadily transitioned from an infrastructure-led operation into a services-led organization with deep capabilities spanning cloud delivery, platform engineering and managed operations.
>
> We are deliberately moving away from low-margin revenue and choosing to focus on higher-value opportunities with our hyperscaler partners. Our public cloud business is aligning its capabilities from cloud adoption to AI and production, and we will concentrate investment on data and AI-led enterprise transformation, AIOps-driven managed services and forward-deployed engineering talent that operates across hybrid environments from edge to core to cloud.
>
> *We are reducing our public cloud revenue estimate for 2026 by $125 million, driven by this decision to exit low-margin public cloud infrastructure resale revenue and a continuation of the trend of hyperscaler direct contracting*.

32.    During the same call, Defendant Marino stated, in relevant part:

Our new Private Cloud revenue outlook is $1.0 billion to $1.05 billion, which is $25 million lower relative to our prior expectation. This $25 million is comprised of colocation and basic hosting revenue in Private Cloud, and we will redeploy that capacity and capital towards higher-yielding AI deployments.

33.    On this news, Rackspace's stock price fell $2.21, or 33.6%, to close at $4.37 per

share on July 9, 2026, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

34.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased

or otherwise acquired Rackspace securities between May 7, 2026 and July 8, 2026, inclusive, and

who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers

and directors of the Company, at all relevant times, members of their immediate families and their

13

legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Rackspace's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Rackspace shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Rackspace or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

14

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Rackspace; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

39.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

40.     The market for Rackspace's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Rackspace's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Rackspace's securities relying upon the integrity of the market price of the Company's securities and market information relating to Rackspace, and have been damaged thereby.

41.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Rackspace's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Rackspace's business, operations, and prospects as alleged herein.

15

42.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Rackspace's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

43.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

44.     During the Class Period, Plaintiff and the Class purchased Rackspace's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

45.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

16

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Rackspace, their control over, and/or receipt and/or modification of Rackspace's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Rackspace, participated in the fraudulent scheme alleged herein.

46.     The Public Cloud was a core operation of Rackspace, constituting a majority of Rackspace's revenue. A $125 million revision to the largest segment is an issue of which Rackspace's management, including the Individual Defendants, would have been aware.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

47.     The market for Rackspace's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Rackspace's securities traded at artificially inflated prices during the Class Period. On June 17, 2026, the Company's share price closed at a Class Period high of $7.53 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Rackspace's securities and market information relating to Rackspace, and have been damaged thereby.

48.     During the Class Period, the artificial inflation of Rackspace's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Rackspace's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Rackspace and its business,

17

operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

49. At all relevant times, the market for Rackspace's securities was an efficient market for the following reasons, among others:

(a) Rackspace shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Rackspace filed periodic public reports with the SEC and/or the NASDAQ;

(c) Rackspace regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Rackspace was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

50. As a result of the foregoing, the market for Rackspace's securities promptly digested current information regarding Rackspace from all publicly available sources and reflected such information in Rackspace's share price. Under these circumstances, all purchasers of

18

Rackspace's securities during the Class Period suffered similar injury through their purchase of Rackspace's securities at artificially inflated prices and a presumption of reliance applies.

51. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**<u>NO SAFE HARBOR</u>**

52. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading,

19

and/or the forward-looking statement was authorized or approved by an executive officer of Rackspace who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

53.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

54.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Rackspace's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

55.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Rackspace's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

56.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

20

continuous course of conduct to conceal adverse material information about Rackspace's financial well-being and prospects, as specified herein.

57. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Rackspace's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Rackspace and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

58. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

21

59.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Rackspace's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Rackspace's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Rackspace's securities during the Class Period at artificially high prices and were damaged thereby.

61.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff

and the other members of the Class and the marketplace known the truth regarding the problems that Rackspace was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Rackspace securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

64.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

65.     Individual Defendants acted as controlling persons of Rackspace within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other

23

statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.     As set forth above, Rackspace and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

24

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  July 29, 2026                     **GLANCY PRONGAY WOLKE & ROTTER LLP**

By:  _/s/ Gregory B. Linkh_
Gregory B. Linkh (GL-0477)
745 5th Avenue, 5th Floor
New York, NY 10151
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
clinehan@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

_Counsel for Plaintiff John Morgan-Reed_

25

# SWORN CERTIFICATION OF PLAINTIFF

## RACKSPACE TECHNOLOGY, INC. SECURITIES LITIGATION

I, John Morgan-Reed, certify that:

1. I have reviewed the Complaint, adopt its allegations, and authorize the filing of the Complaint on my behalf.

2. I did not purchase the Rackspace Technology, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this federal securities laws.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Rackspace Technology, Inc. securities during the Class Period set forth in the Complaint are as follows:

   (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class in any action under the federal securities laws (15 U.S. Code, Chapter 2B; and 15 U.S. Code, Chapter 2A, Subchapter I) during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

7/20/2026

_____
Date

_____
John Morgan-Reed

**John Morgan-Reed's Transactions in Rackspace Technology, Inc. (RXT)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 7/6/2026 | Bought | 22,149 | $6.1443 |